Good morning, Your Honors, and may it please the Court, Kathleen Sullivan representing Mr. Cory King. The appeal from this case is one from a criminal conviction we believe is unprecedented. We know of no other criminal conviction in which a defendant stands federally convicted for failing to have a state permit to inject uncontaminated water into a part of the ground that does not involve an underground source of drinking water. In other words, a case that involves no contamination or waste and a case that involves no underground source of drinking water and a mere failure to obtain a state permit, as to which the State of Idaho was satisfied two years before the indictment. There is in the record a cease and desist order and a consent decree agreed to by the State of Idaho, which administers the safe drinking water program through its Department of Water Resources, in which Cory King and his partner and the Double C Farms agreed to cease injecting clean water into wells on their farm. The Federal interest should have been shot at that point. It sounds as though they violated that. It was stipulated at the Federal trial, Judge Fletcher, that Mr. King injected water into wells without a state permit. Correct. The question here, to go back to Judge Alderson's point... No, no. I think it's irrelevant. It's irrelevant. The point here is, is there a Federal jurisdiction? I don't understand. But you are telling us that he had made an arrangement with the State not to inject clean water. Correct? That's correct. But then he did it anyway. Correct? No, not at all. Not at all, Your Honor. The allegations were about injections that arose to the attention of the State Livestock Inspector in 2005. There was an arrangement with the State Department of Water Resources in 2006 to cease and desist. Correct. There was absolutely no continuing violation after a State. The injection ceased on June 2nd, the moment that there was any advice from the State that there was a problem. So what I'm getting to is really Judge Alderson's point, that Federal jurisdiction is at the core here. And there are only two ways that the Federal Government can possibly get this case within the ambit of the Commerce Clause authority. One is to make it a waste case, and it's not a waste case. The other is to make it a safe drinking water case about underground sources of drinking water, and it's not a drinking water case. If I could begin with the waste. And I want to be, if I leave you with no other impression today, the most important Are you trying to isolate this aquifer out from the overall regulatory system that addresses plain water and waste water? Not at all, Your Honor. If the Government had come forward and said you are injecting into a source of, an underground source of drinking water. What they did was they, the law establishes that there may be exceptions when some kind of activity can go on, but it sets up a regulatory regime, permit process, calls upon the permittee, prospective permittee, to establish that it isn't going to affect, isn't going to create pollution of the water. So it's not as if you can't do it. It just puts a burden on you to do it. Your Honor, our key point here is that the Federal Government, at the time it comes in to enforce the absence of a State permit, the Federal Government, in order to have Federal jurisdiction, has to show a link in its enforcement action to a Federal interest. The Government here has an over- I have a little trouble understanding here. You have the idea of the Federal Government not having an overarching interest in clean water and non-pollution is somewhat mind-boggling. That's not what we're arguing, Your Honor, at all. We're arguing for a- I understand. I want to make sure I understand if we're on the same page as to the regime. My understanding is that section 300HB1 establishes the prevention of underground injection, which endangers drinking water, defined by subsection D2, and that underground injection endangers drinking water sources if such injection may result in the presence in underground water which supplies or can reasonably expected to supply any public water system, and then says that the State can set up a regime to prohibit any underground injection that is not authorized by a permit and shall require that the applicant for the permit to inject must satisfy the State that the underground injection will not endanger drinking water sources. So- Oh, that's correct, Judge Fischer. But we – what we argue to you is that when the Federal enforcement action takes place, the Federal Government must satisfy the language of the statute that you just read by pleading and proving a contaminant went into an underground source of drinking water. And the State can demand a permit for any use of water. It need not be tied to a Federal interest. The State could ask for a permit before you use water to brush your teeth. But for the Federal Government to punish a person for using water to brush their teeth and to demand a permit for any use of water, the State must satisfy the statute that you just read by pleading and proving a contaminant went into an underground source of drinking water. Under felony conviction, an injection of clean water to aquifers that were never linked to any public source of drinking water, present or future, you can look through the superseding indictment and there's not one allegation. The Government never sought to show that there was an underground source of drinking water here. It's the drinking water statute. It's not the water or the clean water statute. It's the drinking water statute. And the Government neither pled nor proved that there was any contaminant or waste. It started out that way, but that case collapsed. And I want to go through that with you to show you that there's no waste in this case to rescue it. But at the beginning, there's no drinking water in this case. Even the superseding indictment, the one that eliminates the reference to wastewater, has no reference anywhere to the language, Your Honor, you just read. There's no language to a public source of drinking water from D-2, and there's no reference to an underground source of drinking water in B-1. Now, Idaho, Your Honor, if you look at the Idaho statutes, the Idaho statutes are quite broad. They require a permit for injections into any water. They don't limit it to underground sources of drinking water in the way the Federal statute does. That program was approved by the Federal Government. But what we're saying is very, very narrow and very, very modest. We're saying most safe drinking water cases are going to arise where there is injection of contaminated or wastewater into underground sources of drinking water. That's what the statute's about. And we've located only two cases in which anyone was ever criminally prosecuted federally for injecting contaminants into underground sources of drinking water, and both of them involved chemicals going into urban settings, furniture shop runoff. These were cases in Colorado and Utah. One resulted in a plea under the Safe Drinking Water Act, one to another act. Those are the core of the Federal enforcement authorities, people who put waste or contaminants into the ground in a way that endangers public sources of drinking water. But you are undoubtedly familiar with an awful lot of the Clean Water Act cases. In Clean Water Act cases, any injection of water, even water of a slightly higher temperature, let alone irrespective entirely of the content of that water, is a violation of the Act, assuming that it needs a permit. The fact that it's clean water is not a reason why you don't need a permit under Clean Water Act. But this case is not about water. It's about drinking water. And there's a lot of water in the country that's regulated by other acts, including the Clean Water Act. Drinking water is what Congress aimed at here. Drinking water was not pled or proved here. In other words, there may be aquifers that are under the Double C Ranch that have nothing to do with drinking water. Kennedy. Well, how about Statute 308B-1B? And I'd like you to comment on that and also on the Sporhase and Nebraska case. Your Honor, this has nothing to do with water in the sense that Sporhase v. Nebraska looked at it. In that case, water was a commodity that was being sold across State lines. Right. And the State was prohibiting its export across State lines. The Federal jurisdiction was clear there. It was a dormant commerce place about interstate commerce in water. There's no commerce in water here. What Mr. King was doing, because the government failed to prove he was putting any wastewater in the ground, was taking clean water from creeks, injecting it into underground storage facilities, wells, to use later in a very dry and parched area for irrigation. There's no contamination. So Judge Fisher's reference to D2 is absent. D2 plainly references a contaminant. And there's no underground source of drinking water. Water, he's not going to go somewhere else and buy water. If I can interrupt, the charge here is that he needed a permit. And had he sought a permit, he may well have gotten a permit for precisely the reasons you're going forward. If there's no harm with what he's doing, a permit should have been easily available to him. Your Honor, there are serious questions here about knowledge which were raised at trial and we're not going to discuss them here. But he went and sought a permit in 1987. He was told by the State that he needed to fill out two permits. One was later denied because of drought. The other one was never acted on. But the point of the case is that he had no permit. That's correct, Your Honor. And a permit, if what you say is true, should have been easily available. Judge Fletcher, this case, we're asking for a narrow as-applied exception to a regime in which we will not impair the Federal interest at all. The State will have a permitting scheme. The State can have a broader permitting scheme than the Federal Government can. We're just saying ---- And you're asking that on the ground that if it were applied to this case, it would be an unconstitutional expansion of the Commerce Clause? We believe that you should avoid the serious constitutional question under the Commerce Clause by interpreting the statute to require that the government prove underground source of drinking water and contamination, or at a minimum, underground source of drinking water. Do you also argue that, in fact, application of the permit requirement here would be a violation of the Commerce Clause? In the absence of contamination and underground source of drinking water, we think yes, that it would violate the Commerce Clause to criminalize absence of a State permit where there's no Federal interest. That strikes me as a near frivolous argument. Well, the judge didn't think so. The trial judge believed that we think that you avoid the constitutional question. Well, the trial judge was very polite, but he rejected the Commerce Clause argument. He did initially require as an affirmative defense. He said you should be able to prove, the defendant should be able to prove, even if the government doesn't have to, the defendant should be able to prove that he didn't put any contaminant in and he didn't put any ‑‑ there was no underground source of drinking water. That certainly gives rise to a Catholic bishop theory that there's two plausible interpretations of the statute. Judge Fisher just read the prefatory language in 300HB1 and the definition in 300HD2, both of which refer to underground source of drinking water and contaminant. That's ‑‑ that was so persuasive to the district judge that initially he thought that Mr. King had to be allowed to have an affirmative defense of no contaminant and no underground source of drinking water. So our interpretation is at least plausible, and we're just suggesting that you interpret the statute to avoid the constitutional issue here. We're not asking you to rewrite the statute. Idaho can continue to have its broad permit requirement. We're just asking you to say that the Federal government can't come in, and in the  interest, an actual Federal interest in underground drinking water or an actual Federal interest in waste, and criminalize the absence of the State permit. That's something for the State to decide. Kennedy. I'm still trying to understand your argument. You're saying clearly the Federal regulation is looking at drinking water. That I understand. Is what you're saying that they have to establish, they can't apply it to an aquifer which is not used as drinking water? They can't apply it to a mere failure to obtain a State permit, absent of showing that the non-permitted party put a contaminant into an underground source of drinking water. You could imagine a case in which there's a contaminant and they haven't proved an underground source of drinking water, or there's an underground source of drinking water, Judge Fletcher's hypo, and they haven't proved a contaminant. But here they proved neither. They pled and proved neither. They just said we're going to come in as the Federal Government, and after you've already settled out with the State, we're going to hammer you with a Federal felony conviction, merely because you didn't have a State permit for an injection. You think after Lopez and Morrison, the Federal Government needs more than just a house that Jack built to get from the injection to the environmental interest here. The environmental interest is in protecting safe drinking water. You can't say that the failure to get a State permit under a State permit system that's much broader than anything the Federal Government could require on its own, it necessarily implicates a Federal interest. But even if you disagree on the Commerce Clause argument, we think you should read the statute narrowly to avoid the problem. If I could turn to the false statement. There's a false statement. Count 5 involves a false statement in which we think you have an easy ground for reversal, even if you don't reverse the injection counts. We think you should reverse the injection counts, because the false statement was not made within the jurisdiction of the EPA. It is charged and it was charged as a statement made. This is the statement where Mr. King supposedly says to a State livestock inspector, the pivot, this well goes to a pivot. That means the water from here goes to a sprinkler. And they said, no, it doesn't. It actually goes to an underground well. Now, who did he say that to? He said it to Mr. Climbs. Who is Mr. Climbs? Mr. Climbs is an official of the Idaho Agriculture Department. He's a livestock inspector. He has nothing to do with the EPA. So on June 2nd, when this statement is made, June 2nd, 2005, the statement is not made to anyone connected to the EPA. The EPA does not as yet have any jurisdiction. Why not? Because under the statute, the State of Idaho has primary enforcement authority. That's the – and while the State of Idaho has primary enforcement authority, the EPA is not yet in the picture at all. But even if the EPA had any enforcement authority at this time, the – I don't understand what you mean, at this time. June 2nd. No, I understand. I understand the date. But I'm trying to understand what you mean by the qualifier. That is to say EPA has enforcement authority. And the statute reads, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the government. So we're not talking about the person to whom the statement is made. The statute talks about the matter within the jurisdiction. But, Your Honor, at 42 U.S.C. 300H-1, subsection 3, the State shall have primary enforcement responsibility for underground water sources. This is a Federal State system. Until Idaho can be divested of it. Please don't talk over me. Sorry? I heard the word primary. No, no, no. But, Your Honor, there's a – I'm still trying to talk to you. I heard the word the State has primary authority. That doesn't mean the Federal Government does not also have authority. Your Honor, the Federal Government has to notify Idaho and give it 30 days to enforce on its own before it can take enforcement action under the civil provision of the statute. But even if you're right, Your Honor, even if we say the EPA has background authority, the statement is made to a livestock inspector, not to a Department of Water inspector. So under this Court's decision, it's Bikini. I understand that perfectly. And the statute says, in any matter within the jurisdiction, and I'll paraphrase, it's not within the jurisdiction of the Federal Government. Your Honor, the indictment and the charge requested by the government and the charge given to the jury was not within the Federal Government. It was within the jurisdiction of the EPA. That's how this case was charged. It didn't have to be charged that way, but it was. And a livestock inspector has nothing to do with the EPA. He isn't funded by the EPA. He doesn't have any authority to report to the EPA. The EPA doesn't supervise him. Had the statement been made to an Idaho Water Resources Department inspector, that would be a different case. But under Bikini, this case is not. I understand why you're saying this, but you're not taking my point. The statute is not written in terms of the person to whom the statement is made. But, Your Honor, Bikini requires that there be a direct relationship between the statement and the Federal Government interest in the case. And the Federal Government interest here is a water issue. I'd like to address the government's misconduct in closing, but I'd like to reserve some of my time for rebuttal. No. You know, this is an important case. Say what you want to say. But before you get there, I'd just like to understand what your theory is. You're saying that because the indictment charges it as within the jurisdiction of the EPA, that whatever the statute may mean more generally as the indictment charges it. Narrowed the statute. That's exactly right, Your Honor. Then they're bound by what the indictment says. That's right, Your Honor. And the charge. I refer you to ER-299. That's the indictment. It says that you made a false statement within the jurisdiction of the EPA. At further excerpts of record 10, you see the instruction as given. And if you go to further excerpts of record at 27, you'll see that the charge as given was the one the government requested. And the government requested a charge within the jurisdiction of the EPA. So for the government to refer to the background authority of the attorney general to indict cannot control this case. The charge here was made by the government, instructed to the jury, and controls this case. And a statement to a livestock inspector who reports to the agriculture department cannot be within the jurisdiction of the EPA, nor can the statement be related to the jurisdiction of the EPA. Any more than a statement to a State trooper in a traffic arrest about one's taxes could be – could satisfy an indictment made and charged to the jury about a false statement within the jurisdiction of the Internal Revenue Service. It's just the wrong department. So the false statement count is legally incorrect and at a minimum has to be thrown out. But if I could just go to the government misconduct in closing, I think it's – Scalia. Well, take what time you need for it, because I'd rather you get all your argument out, and then when you're in rebuttal, you're not being forced to make your – what would have been your principal argument. So go ahead. Kagan. Thank you very much, Judge Fletcher, for the additional time. I would like the Court to focus on what really happened in this case as revealed in the improper use of a government witness from the agriculture department called Mr. Chatburn, and the use of his false testimony in closing. And what happened here is that this case began as the kind of case you might think could come up under the Safe Drinking Water Act. It began as a case in which there was a false and defamatory statement about putting processed wastewater down into wells. Now, no good farmer would put processed wastewater down into his wells. He'd want to keep it in a waste pond and put it on his fields where the phosphate and the nitrogen exert fuel. Now, this is a case in which you have to do a full investigation. And the State Department was being the first to bring a new trial in here. And you're arguing as truth something that was contested and then kept out because it was contested. So please don't argue that as truth. Your Honor, I'm not arguing it as truth at all. What I'm trying to show is that the misconduct at trial, that warrants a new trial, even if you disagree with us on throwing out the indictment, a new trial really is required here. Because the wastewater references that were kept out, the government reintroduced into trial. The first person the government put on the stand, the only federal government official on the stand, made a reference in violation of the motion in Lemonnet order to wastewater. Four times. I understand. Four times in the demonstration. But what I really want to get to, Your Honor, is the use of false testimony in the  This really is a violation of this Court's holding in Hays, that the government is not to use false statements by a witness. And it has a duty to come back, as you were speaking about in the last argument, to correct any untruth that is introduced. And to show this, I want to make it very simple. Mr. Chapman is an Idaho livestock official to whom, who testified at his suppression at the suppression hearing, that when he asked Mr. King, are you injecting processed wastewater into the ground, Mr. King said no. The second time he said it so colorfully that nobody could remember it, nobody could forget it. If you look at ER 286, the suppression hearing, he said, Mr. Chapman reported asking Mr. King, are you putting processed wastewater in the ground? And the prosecutor said, well, yeah, he said, no, I wasn't putting processed wastewater in the ground. And at 286, he said, did he use that term? And he said, no, he used a more colorful term. And I say it with the indulgence of the Court, in quotes, shitwater. He said, I wasn't putting processed wastewater, manure water, into the ground. At trial, you can find those at the suppression hearing evidences at ER 279 to 80 and 285 to 86. Then comes trial. Now we have the order in Lemonade saying don't talk about wastewater. Does the government observe that? No. They put Mr. Chapman on the stand, and at ER 155 and 156, he says, Mr. King denied putting any water in the ground. That's false testimony. He denied putting processed wastewater in the ground. Well, he doesn't quite say that. It's odder and more ambiguous. He says, did he deny the allegations? But the allegations ñ it's known to the government that what he denied was wastewater allegations. I understand that. But you're telling me that he said words that he didn't say. No, what he said was in response to the question about allegations, he said no. Now, I understand the background. The allegations that were made. I understand the background reference, but that's not what he said. Judge Fletcher, in a case ñ actually, he said no fluids. On page 155, if I recall correctly, he said no fluids. Page 155 at line 20. And you describe the ñ I'm sorry, Your Honor, do you have it? I have it right here. And you describe the allegations being essentially that there were allegations that they were injecting fluids into wells. Yes, sir. And Mr. King provided no response. That's correct. And that's not true. The allegation was are you putting processed wastewater, not any fluids. And he denied putting processed wastewater in. He did it more colorfully on June 16th. Your Honor, there are problems with double negatives. The question is, and you describe the allegation as being essentially that there was allegations that they were injecting fluids into the wells. That does not specify what kind of fluids. The allegation was they were injecting fluids. And Mr. King provided no response. Correct. So there was an allegation that they were injecting fluids. That's correct. If you compare that, however, with ñ Would you please let me finish? Sorry. The question is there was an allegation he was injecting fluids into the wells, which was right. And then he provided no response. He says no, he didn't provide any response. Fluids, of course, could mean wastewater, could mean ordinary water. And, of course, the government is now operating under a constraint. It can't use the term wastewater. Your Honor, the government's obligation is to correct false testimony, not by the standard of perjury. That's ñ this Court in Hayes made clear that you don't have to actually prove that there's a perjury or the elements of perjury are made out, a case in which you recall. Let's think about this case. It involves highly technical regulations. A lot of talk about regulations that are hard to follow. It involves one very salient false statement case that the jury can ñ counts that the jury can understand. And what the government does here is it exploits this Chatburn testimony in summation and rebuttal summation to try to do a kind of backdoor 404B. He lied once, he lied again. And if you look at what the government does on ER 261 and 272, it actually tries to say he was a liar. And you cannot look at what was said to Mr. Chatburn according to the suppression hearing testimony and say that it was a lie. He denied injecting processed wastewater. That, as far as the record is concerned, is true because the government never proved that there was any processed wastewater or manure water ever put in the ground. So the government turned a truthful statement, which it described at the suppression hearing, into an apparent false statement with Mr. Chatburn. And even if you were right as to whether Mr. Chatburn was technically dancing around the order in limine, I would just ask, Your Honor, to please look at what the government does with it on ER 261 and 272, especially on 261. This is in the opening summation, line 4. The defendant, Mr. King, says, no, I have not injected. Clearly a false statement, inconsistent with the stipulation that's now before you in this case. Well, that's, we submit, a plain Hays violation. The government here is calling Mr. King a liar by manipulating testimony under the constraint of the order in limine to say that he said, I didn't inject. That's false. That statement by the prosecutor is false. Mr. King did, according to Mr. Chatburn, say, I did not inject processed wastewater. He did not say, I have not injected. And to show up at the summation and then exploit it and try to drive it home on page 272 in the rebuttal summation when there's no chance for Mr. King to respond is a violation of the U.S. Attorney's duty to serve the truth and not to exploit an untruth. And if I could just leave you with the rebuttal summation point from 272. On 272, when Mr. King was confronted, he denied an injection. That is not true. And Mr. Chatburn didn't testify truthfully at the trial to that. What we, to tie it back to the original point, Your Honor, had this been a waste case, there would be no question we would be within the Commerce Clause. Had there been waste put in the ground as the government tried to insinuate, we wouldn't be here talking about the Commerce Clause. But there was improper conduct in the trial and at the summations that tried to make a non-waste case into a waste case. At a minimum, there should be a new trial based on that misconduct. And thank you for indulging me with extra time. You're very welcome, of course. Good morning, Your Honors. Serena Case Hargrove representing the United States. In United States v. Raich, the Supreme Court made it extremely clear that when Congress regulates a class of activities that are economic, the Court will not excise a small class within that broad class, even if it is purely intrastate. And in Raich, the Court did explain to that and so held. And that Raich is very similar to this case in that respect. Raich, though, is different in another important respect. It, too, was an as-applied challenge. But in that case, it was clear that the Petitioners fell into the category they were arguing should be accepted. And I would just like to clarify that that's not clear here. It is true that the government did not prove that the fluids injected satisfied the definition of processed wastewater. We couldn't prove that there were the precise number of fecal coliform colonies of bacteria in the water that would justify the label processed wastewater. That said, it was irrelevant, really, and it is irrelevant to the Safe Drinking Water Act charge. The defendant never made an offer of proof either that this was somehow pure water. The defendant noted that our expert at sentencing could not prove the precise levels of fecal coliform. That's totally true. The defendant's expert at the sentencing also acknowledged that the water was dark brown and foamy. He just argued that that came from something besides manure. So I have an issue with discussing this as though it's a situation in which we're dealing with pure water. It's irrelevant. We don't know. It was not proved either way. And the same is true in terms of the underground source of drinking water. The government did not have to prove under the statute that the injection was into an underground source. It is on the burden. It's the burden of a potential injector to prove that no harm will come to an underground source. And that's ordinarily done through the permit process. Exactly. And Congress very carefully placed that burden on the proposed injector because Congress recognized that the situation for each injection everywhere in the country will differ. It will differ because the underground geography differs everywhere, and it will differ because different things will be injected and different volumes at different pressures. Congress specifically recognized that pressure was important. So to the extent we want to talk about a hypothetical in which really clean water was injected into the earth or into an aquifer, it's important to note that Congress had a good reason for including that within its scope as well, because pressure matters, and Congress concluded that. Now, the government did not prove that this was an underground source. That's absolutely correct. We didn't allege it in the indictment. We did not need to prove it according to the statutory language. That said, we know that it was a very large aquifer and a very productive aquifer. When you're talking about statutory language, are you referring to 308? 300H? Yes. Yes, Your Honor, precisely. 300H1B1, I believe, or 2B1. B1 capital B. Exactly. Yes. Now, Congress recognized that when states, and this provision provides that when states have permit programs, they must place the burden on the potential injector to prove that there will be no harm to drinking water. This makes abundant sense. Congress recognized that once the government can prove there's been contamination of an underground source, it's too late. Remedying contamination is extremely expensive and, Congress recognized in some cases, simply impossible. It has a terrible effect on commercial growth of a region, and Congress found that it had already happened in certain circumstances. So Congress very carefully placed the burden on potential injectors with good reason. It also specifically noted that prior statutory schemes which tried to do after-the-fact remedies were inadequate, especially for such a vital national resource. I'll move on to Section 1001, Your Honors, unless you have questions, further questions. Well, let me ask you this. Assuming that we agree with the other side, that there is at least a constitutional question that should be avoided if possible. How do you respond to that when we're now focusing on possible ambiguities in the statutory language? So you're asking, are there statutory ambiguities? That's my question. There are not statutory ambiguities. The purpose of Congress in enacting the Safe Drinking Water Act was to protect underground sources of drinking water. On that, we absolutely agree. And to do that, it enacted a broad comprehensive scheme, the first part of which isn't even relevant to this case, the second part of which was governing underground sources, seeking to protect them. Now, the way Congress did that was it chose to prohibit virtually all injections and certainly commercial injections. It chose to prohibit absent permit. Exactly. Without a permit, you cannot inject. And it accepted family-sized septic tanks and so on. But without a permit, you can't inject until you've come forward and shown to us that the conditions underground are such that when you inject what you want to inject at the pressure you want to inject with the volume you want to inject, it will not find its way and somehow compromise an underground source of drinking water. So B 300H, B1 has the initial language explaining we want State programs that will be able comprehensively to protect underground sources of drinking water. And then B1A and B explain how Congress will do that. And A says that Congress will require a permit. B says that Congress or, sorry, that the State will require a permit. And B says that the State will place the burden on the potential injector to prove no harm to underground sources. Now, those two minimum requirements that Congress enacted are perfectly they perfectly correspond to the Idaho statute. So Idaho Code 42-3903 requires a permit before anyone can inject in a deep well. There are other rules that also protect safe drinking water for somewhat shallower wells, but for any deep well injection, Idaho requires a permit. And then Idaho Code section 42-3904 sets out in some detail all of the things that a potential injector needs to show in order to obtain a permit. It needs to explain the geological environment into which they want to inject. It needs to, you know, describe with great detail the substances that they want to inject. And we have an example of this, these requirements in the record, because Mr. King himself applied for a permit in 1987. And that is in the record. And there are a number of requirements there. You're not allowed to have cows within the area for 30 days. You have to make sure that the water is pure. You can't be using certain chemicals. There's a long list of requirements. And those requirements from Idaho Code 42-3904 correspond perfectly to 300HB1B, the minimum requirements of the Safe Drinking Water Act. So there is no statutory ambiguity. I would say a second point supporting that is if you look at the definition section of 300H, it's 300HD1, it defines the terms underground injection and the term underground injection that endangers a drinking water source separately. Underground injection has a very broad meaning. It means the subsurface emplacement of fluids by well injection. Okay. And that definition is the one that is used in 300HB1A, that a State permitting program shall prohibit any underground injection, except for these exceptions dealing with rules that we're not concerned about it here, in such State which is not authorized by a permit. The definition section under D2 explains precisely what underground injection that endangers drinking water sources mean. And that means if such injection may result in the presence of underground water which supplies or can reasonably be expected to supply any public water system. That definition corresponds to 300HB1 and in B1B. It corresponds to the injector's burden. One other note and that is that the definition of an underground source of drinking water is extremely broad. And we did not prove, we didn't need to prove that the injection was into an underground source and we didn't at trial. But there was evidence at sentencing that established that the aquifer actually was an underground source and there's also an off-the-record answer here that's off-the-record. So unless there are further questions, I will go on to 1001. The Ficini case emphasizes exactly, as Your Honor said, that the relationship that 1001 is concerned with is the relationship between the lie and an authorized function of the agency. It's not the relationship of the person to whom the lie was told in the agency. There's actually a separate statute that was discussed in the previous case about lying to a Federal agent. This isn't that statute. Now, there are two primary ways that an agency can show that a statement was within its authorized function. And in Ficini, they talk about it as the agency is empowered to act. If the agency is empowered to act on the false statement, then it's within the agency's jurisdiction. In Wright, the Court explained that concurrent authority is enough. So when you have a situation in which a State has primary enforcement authority, as we have here for some provisions of the Underground Injection Control Program, the fact that the Federal agency retains some jurisdiction to investigate and enforce is sufficient according to the Wright court. But here we have more than that, because Judge Windmill held, and they have not appealed that holding, that the Court or, sorry, that the agency is able to investigate and help prosecute willful violations of the statute. And this is in 300H-2. So if a violation is willful, the agency does not have to provide notice to the State first. But Wright says that even if the agency did have to provide such notice, that's okay. Concurrent jurisdiction suffices. So an agency has the power to act if it has concurrent jurisdiction. And Rogers explained, the Supreme Court explained in Rogers that it's not just the power to see an investigation all the way through to the end result of a conviction. It can just be the power to investigate. And in Rogers, that was the question. It was FBI agents. And they had the power to investigate. And that was sufficient to make it within the agency's jurisdiction. In terms of a limiting principle, I think there are concerns that the statute doesn't itself require the statement to be made to anyone in particular. And there might at some point need to be a limiting principle there. This is not the case for that. The Oren case is far outside. We are well within the bounds of Oren here. Because in Oren, the false statement at issue there was made to an independent appraiser, a private party, who was contracting with a nongovernmental organization that had a land trust, that had a prior history in relationship with the Park Service. But in that case, there was no evidence of any formal agreement between the NGO and the Park Service. And that was okay. Well, counsel argues that you charged it as being within the jurisdiction of the EPA. What's your response to that? It was within the jurisdiction of the EPA, Your Honor, because the EPA had the power immediately to investigate and help prosecute. No matter who they made the statement to. Or who he made the statement to. Exactly. As long as it concerned the subject matter that was within their authority. Exactly. Exactly. And when you look at it, I mean, the statement was made to a government investigator who was in the process of investigating something. Now, does it matter that, in fact, he was a State investigator who was not a water investigator? Does that matter? Well, Your Honor, he worked for the Department of Agriculture. No, it doesn't. No. And the fact of the matter, though, is that's not even an entirely correct characterization because agriculture, well, concentrated animal feeding operations like the one Mr. King has with 15,000 to 20,000 head of cattle, they're point sources under the Clean Water Act. And so Department of Agriculture inspectors do actually have a great deal to do with EPA and the Clean Water Act because they're the ones who are on the ground looking for those violations. That's usually the kind of violation they find. They're not used to finding safe drinking water act violations. But they are looking for Clean Water Act violations. In fact, from the story we get here, I gather he wasn't looking for this at all. No. And the employee of the ranch comes up to him and says, hey, take a look. Right. Inspector Quimes was only there because Mr. King wanted to expand his feedlot operation. That was the purpose of his visit. Yes. And if the guy had been there on time, he probably never would have found the thing  Probably so. Probably so, Your Honor. I would like to address the allegations of government misconduct as well. Yeah. Specifically the Chatburn question. Yes. So first of all, I think that counsel may still be confused about what happened on June 2nd versus June 16th, because Inspector Chatburn testified entirely truthfully that Mr. King did not respond on June 2nd to any of the allegations. He stated the allegations. Mr. King remained silent, except to ask who had told who had made the allegations. Then on the next visit on June 16th, Mr. King denied the allegations. And the allegations were processed wastewater. That is what Inspector Chatburn had confronted him with. Now, at trial, the government was trying very hard to deal with this fine line that the Court had drawn. With only partial success. Yes. With only partial success. Yes. Because the Court had said, while we understand that there is manure and there is waste on a concentrated animal feeding operation, we do not allow you to characterize the fluids that were injected. And the Court held in its motion in Luminae that that was off limits. It was irrelevant and it was prejudicial. And there were at least two statements. There was the flash of the illustrative exhibit about how a siphon method could work, and it said waste pond. And then you get all these affidavits from the people out there in the audience who said, oh, we saw it said. Right. Right. So there was that. And that was unfortunate. And the Court found, I think entirely correctly, that was inadvertent. And that it was such a small drop in the bucket, the overall trial, that it wasn't sufficiently prejudicial to merit a new trial. But anyway. But if it was waste, it was a drop of waste of very pollution. Right? We would argue, no, that it hadn't been sufficient to do that. But so Inspector Chapman testified truthfully. And the government, after he was cross-examined by defense counsel, confronted him with his contemporaneous report and confirmed that that was precisely what he had written at that time, too. So he was testifying absolutely consistently. And Inspector Climbs testified consistently with that as well, that first Mr. King didn't say anything on June 2nd, and then he denied it on June 16th. But what do we do with the problem? And I'm sympathetic to both sides on this one, because when King was being questioned, he's being questioned about processed wastewater. Right. In more colorful terms, the SH water. Mm-hmm. Yet, because we at trial, nobody's allowed to talk about wastewater and only allowed to talk about water, we introduce a certain amount of ambiguity in the testimony that I'm not sure whether it makes the testimony untruthful, but it makes the testimony a little misleading as to what actually was said. I would disagree, Your Honor. I don't think it made it misleading. I think it did make it confusing or vague, because the allegations was the phrase that was used about the June 16th denial, and he did deny allegations. What the allegations were weren't specified. The defense argues that they – the jury would assume that they were the same allegations as trial. I don't know that that's true, but it was certainly vague. Well, what allegations are the jury supposed to think? Because the allegation at issue in the trial here is injection of, quote, water. Right. But in fact, he was being questioned about allegations of processed wastewater. Right. And so he didn't deny – and I'm trying to be very specific, and this is the other side's point. Right. He didn't deny the injection of water. He denied the injection of wastewater. That is true. He didn't directly deny all injections. He directly denied merely the injection of processed wastewater. His entire course of conduct was a denial of all injections. And up until the eve of trial, he never came forward and said, oh, no, we were injecting, you know, we just – we knew we couldn't get a permit, so we were just trying to, you know, replenish the aquifer. We were injecting, but it was clean water. That's not what was going on. He – I mean, he was – he had created a whole infrastructure with buried valves so that he could bypass the anti-backflow valves and inject straight into his de-irrigation wells. He had covered the valve with dirt. We have a call that he made after the inspectors had discovered what had been a buried valve. He called his – one of his employees and asked, was that really uncovered, you know, make sure that it's off, and ordered him to other wells. So we have a tremendous amount of evidence suggesting he wasn't coming forward and saying, you know, yes, I'm injecting, I'm just not injecting processed wastewater. No. And he also knew the color of what he was injecting and what was going on. So it's tricky. Now, I will say it was unfortunate. The prosecutor in the closing argument used the term statement when he described that Mr. King had denied the allegations of injections of water. And it's true. Mr. King did not make a statement to that effect. So I have to agree. That was an unfortunate choice of words. It shouldn't have happened that way. I don't believe that was prejudicial, but he did use that term statement. And it wasn't a statement. And in the closing argument, it was a statement.   And it was an objection to that argument by the prosecutor. No. And the Court specifically noted that when it denied the motion for a new trial. There was no objection either to Mr. Chapman's testimony at the time that he gave it at trial, and there was also no objection to the statement by the prosecutor in closing. But the problem is brought to the trial judge's attention. It's not as though it was raised for the first time here on appeal. Correct. They raised it in their motion for a new trial. Yes, Your Honor. If there are no further questions, I would respectfully request that the Court affirm. Okay. Thank you. Thank you. Now, we took you over time, but would you like two minutes in response? If you would permit me, Your Honor. Of course. Thank you for your indulgence. I'd like to just make two points about the injection counts. First, there seems to be some confusion about whether this is about all underground water. The government just talked about all underground water as if all aquifers are connected, and that's just not so. There are aquifers that involve drinking water, underground sources of drinking water, and there are other aquifers. You can get that from the statute. Excuse me. You can get it from the regulation 40 CFR 144.1, distinguishes aquifers that are not underground sources of drinking water from others. So I just want to start, Your Honor, this is not a Clean Water Act case, and even in the Clean Water Act, Rapinos and U.S. Army Corps of Engineers suggest that sometimes we have to distinguish among waters and read statutes narrowly. But the point here is that this case was charged as a drinking water case, and you can't just say water is going into the ground. It must be connected somehow. The hip bone is connected to the thigh bone to drinking water. That's just not the way the statute set up. Isn't it a relevant consideration, as we're evaluating this under the Commerce Clause, that the government starts out with the assumption, reasonable enough, that any particular aquifer may very well be used for drinking water. May or may not be, but may very well be. May be now, may be in the future. And in a sense, it's just saying, okay, let's have the burden of proof come forward in the permitting process. And if someone doesn't get a permit and injects without going through the permitting process, we will apply the assumption against them, given that they had the opportunities through the permitting process to show lack of connection to any drinking water. Well, Your Honor, I think that the burden that the permitting process puts on the applicant is to show that they're not going to put a contaminant in. If you actually look at Mr. King's 1987 application in the record, it doesn't ask any questions about are you putting something into an underground source of drinking water, and that's understandable. And I'm sure that's true. Who would not? Well, and I'm sure the reason for that is, although I'm going outside the record, is everybody knows that that aquifer is being used for drinking water. Well, this one wasn't, Your Honor. So, and there's no proof that it was. Well, at that ranch it was not. But that's a big aquifer. And the people get their drinking water out there from wells. Well, there was actually no proof at trial that it went into any aquifer. And this one. I understand that there was no proof at trial for that. But you're saying that we should assume that this wasn't drinking water because the proof that he was asked in the permitting process was that it wasn't a contaminant. I'm saying that it doesn't necessarily show that at all, because my guess is that everybody and his dog knew that this was drinking water, and therefore the only issue was whether or not there was a contaminant. Well, with respect, Your Honor, that's just not the case. This is a huge ranch. It's not in an urban center. There's no source or potential source. It's also a huge aquifer. Well, Your Honor, there was no the government didn't prove that it went into any aquifer. The reference to the Snake River aquifer in the brief is extra record. But, Your Honor, let me just put it simply this way, that we're asking for an as-applied exception, because obviously you could have a State permit system that says get a smog permit for your car. The Feds want clean air. The State should get a smog permit for your car. But if you prosecute someone federally for having an idle car on cinder blocks in the backyard. No, wait a minute. I saw that. You didn't agree with that? What makes you think that somebody with a car up on blocks with flat tires doesn't turn the car on and run the engine? Well, Your Honor. If he does that, then he'd be violating the smog. That's right, Your Honor. But all we're suggesting here is that once the hammer of the Federal Government comes down to try to reinforce a State permitting system, the Federal Government ought to be obligated to show that there's a connection to the Federal interest, that the car wasn't idle. It would be very easy to show in that case. We're just saying that in a particular. Well, no, not that it wasn't idle, but that unless it wasn't that the tires are flat. It was unused. There's no engine in it. That's right. That would be a better example, Your Honor. Because that's the pollutant, not the tires. So the question, the analogy, to work it back, and that's what I'm having trouble with, is somewhat I think what Judge Fletcher may be driving at, is that it does say that the permittee or the applicant must satisfy that the underground injection will not endanger the public drinking water.   I'm trying to get at whether there's a connection to the Federal interest. I'm trying to get at whether there are sources, whether they be, and this is what you were wanting to make sure is read into the statute, was that either was or reasonably could be. That's right. That's the idea. The burden seems to be on the applicant to show what you are now saying, which is there is no way in heck this is ever going to be drinking water, public drinking water. It's never going to be because of the nature of the aquifer, what's around it, and so on. He has the opportunity to do that in the permitting process. What you seem to be saying is that before the statute can be invoked at all and that obligation placed on it, there has to be a predicate establishment that the aquifer could ever conceivably be used as public drinking water. Given the size of an aquifer and the fact that people do in fact drill into aquifers to get drinking water, I mean, it's a potential use of the drinking water. I just don't understand what you are asking for. Your Honor, what we're asking for is an as-applied exception driven by constitutional avoidance to the statute based on the ambiguity that the colloquy of the Court itself has revealed in the statute. As you read it, Your Honor, the statute refers to underground sources of drinking water that might be contaminated. I don't find it ambiguous. Well, the ambiguity, the ambiguity we see is in whether a mere failure to obtain a permit absent the government's showing of any connection to underground sources of drinking water. That's where I just lose you. I really do. I mean, it's so obvious what Congress wants to do is to protect drinking water sources, and an aquifer, by its very nature, unless it's inherently polluted, is a potential drinking water source. That may well become utilized by the public. So as counsel for the government argued, to come along after the fact once it's been polluted, that doesn't do us a whole lot of good. How many gas stations are, you know, sitting idle because they've polluted leaking storage tanks? So I just don't understand what you're asking for in this case, because the constitutional avoidance was not to make light of it, but the permit allows your client to have come in and gone through the permitting process and demonstrated that this, you know, that this is never going to be a public water source, and therefore, this Act doesn't apply. Well, Your Honor, even if you thought that a farmer had the resources that the government didn't have to define aquifers and figure out which ones might become public drinking water sources, with respect, Your Honor, that's just not the way the regulations read. They don't define all aquifers as underground sources of drinking water. 40 CFR 144.1Q says that aquifers that are not USDWs, not underground sources of drinking water, are not entitled to the same protection. So the Act itself, as interpreted by the regulations, 144.1Q, simply distinguishes my aquifers. It doesn't say all aquifers are interconnected. So our argument here is that we need to be entirely consistent with what Judge Fisher just said, and therefore, you go through the permitting process to find out whether the particular aquifer is, in fact, a drinking water source. I'm sorry. I said section Q. I misread my writing. It was section G. Your Honor, after Raich, let me just try to distinguish this case from Raich because the government mentioned Raich. Her suggestion is any comprehensive We know Raich. I know you do. But Raich is about a market. This is not about a market. This is not about a market for drinking water. It's not spore haze. This is a regulation of an activity, an injection, which is non-economic in itself, just as possession of a gun in school is non-economic in itself. We know Raich and we know Lopez. So we're just suggesting that as applied exceptions, survive Raich.  One is the Federal interest rate, which is a non-economic interest rate activity that has not been shown connected to the Federal interest and there's no connection shown here by the government to the environment because there was no showing of contamination. On false statements, just one quick word, if I may, Your Honor, thank you for your indulgence. I think the government just stood up and made a limitless argument in which they said that as long as the false statement is connected in its subject matter to something within the jurisdiction of the government, it doesn't matter to whom it's said. That means that according to the government, you could speak to your neighbor or your barber or your grocer and that would be within the EPA's jurisdiction if it concerned wastewater. That's not Ficini or Ficini. That's not the law. It's not in 1001. There must be a direct relationship. I'm sorry, Your Honor. Nor is it what happened here. The statement was not made to the neighbor or the grocer. But the livestock inspector had no EPA authority under the Safe Drinking Water Act whatsoever. So thank you very much, Your Honor. We think at a minimum the new trial based on the false testimony would be appropriate. Thank both sides for your very helpful arguments. The case is now submitted for decision. And that's it for today. We'll be back in a slightly different configuration tomorrow morning. Thank you.
judges: Aldisert, Fletcher W. , Fisher